UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

Dunellen, LLC and
Capital Terminal Company

     v.                           Civil No. 09-cv-211-JNL
                                     Opinion No. 2013 DNH 001
Power Test Realty Company
Limited Partnership and
Getty Properties Corp.

     v.

Getty Petroleum Marketing, Inc.

### MEMORANDUM ORDER

This case presents the question of who is responsible for groundwater contamination at a petroleum storage facility in East Providence, Rhode Island.  Plaintiffs Dunellen LLC and Capital Terminal Company, which, respectively, own and operate the facility, originally sued defendants Power Test Realty Company Limited Partnership and Getty Properties Corp., which own nearby parcels and the pipelines installed on them.  The plaintiffs allege that these premises are the source of the contamination and that the defendants have failed to take any action to remediate it following its discovery.

The defendants responded, in part, by bringing a third-party complaint against Getty Petroleum Marketing, Inc., which operated two of the defendants' pipelines between 1997 and 2003 pursuant to a written lease with Getty Properties.  The defendants assert

that Getty Marketing must indemnify them against the plaintiffs'
claims under the provisions of the lease or, in the alternative,
theories of equitable indemnification and contribution.  After
the defendants filed their third-party complaint, the plaintiffs
amended their complaint to bring all of the same claims they
originally brought against the defendants (save a claim for
contractual indemnification) against Getty Marketing as well.

     This court has jurisdiction over all of the plaintiffs'
claims under 28 U.S.C. § 1332(a)(1) (diversity) because
(1) Capital Terminal, Dunellen's sole member, is a Rhode Island
corporation with its principal place of business there, (2) Getty
Properties, Power Test's general partner,[1] is a Delaware
corporation with its principal place of business in New York, and
Power Test's only other partner is a Maryland corporation with
its principal place of business in New York, and (3) Getty
Marketing is a Maryland corporation with its principal place of
business in New York.  Though the defendants are not diverse from
Getty Marketing, this court can exercise supplemental
jurisdiction over their claims against Getty Marketing in the
third-party complaint.  See id. § 1367(a).

---

     [1]Because, by virtue of this relationship, Getty Properties
is liable for Power Test's obligations, see Del. Code Ann. tit.
6, § 15-306(a), this order generally does not distinguish between
Power Test and Getty Properties, referring to them collectively
as "defendants."

Getty Marketing has since filed separate motions for summary judgment, see Fed. R. Civ. P. 56, as to both the defendants' claims against it in the third-party complaint, and the plaintiffs' claims against it in the amended complaint.  As Getty Marketing points out, there is no dispute that it did not cause the contamination on the premises, and, in fact, that the contamination pre-existed Getty Marketing's tenancy.  Getty Marketing argues that, as a consequence, it has no duty to remediate the contamination, and has moved for summary judgment on the plaintiffs' claims seeking to hold it liable for failing to do so.  Indeed, in adjudicating an enforcement action against both Getty Marketing and the defendants, a hearing officer at the Rhode Island Department of Environmental Management found that the responsibility for remediating this pre-existing contamination fell to Power Test, as the property owner, rather than to Getty Marketing, as the tenant.

In moving for summary judgment on the defendants' third-party claims, Getty Marketing argues that this finding collaterally estops the defendants from obtaining indemnification or contribution from it against the plaintiffs' claims, whether under the parties' lease or theories of equitable indemnification or statutory contribution.  Getty Marketing further argues that, regardless of the preclusive effect of the hearing officer's finding, the lease does not entitle the defendants to

3

indemnification for pre-existing violations of environmental law on the premises, such as the contamination at issue here.  The defendants, for their part, have cross-moved for summary judgment on their claim for indemnification under the lease.

As explained fully _infra_, the court agrees with Getty Marketing that, in light of the hearing officer's findings that Power Test--and not Getty Marketing--is responsible for failing to abate the contamination on the leased premises, the defendants are collaterally estopped from seeking to shift that responsibility to Getty Marketing through their third-party claims for indemnification and contribution.  The court further agrees that, regardless of these findings, the parties' lease does not entitle the defendants to indemnification from Getty Marketing against the plaintiffs' claims, because they arise out of pre-existing environmental violations on the premises. Finally, the court declines to recognize the plaintiffs' theory that, simply because the contamination was discovered during Getty Marketing's tenancy over the premises, it is liable to the plaintiffs for failing to remediate it, even though the contamination pre-dated the tenancy and Getty Marketing never controlled any instrumentality that caused it.  Accordingly, Getty Marketing is entitled to summary judgment on both the plaintiffs' claims and the defendants' third-party claims.

4

## I.   Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial, and "material" if it could sway the outcome under applicable law. See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" parties. Id.  On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998) (quotation marks omitted).

## II.  Background

## A.   Historical facts

The facts material to the summary judgment motions are largely undisputed.[2]  In 2002, engineers working for the

---

[2]Indeed, the defendants do not dispute any of the facts set forth in Getty Marketing's statement of undisputed facts, see D.R.I. L.R. Civ. 56(a)(1), and did not file a statement of disputed facts, with the result that the facts stated by Getty Marketing are deemed admitted, L.R. Civ. 56(a)(3), at least by the defendants.  While the plaintiffs filed a statement of disputed facts, it neither denies or otherwise contravenes the

plaintiffs discovered light non-aqueous phase liquid ("LNAPL") in a groundwater monitoring well located on Dunellen Road, a city street running between one of the plaintiffs' parcels (known as "Parcel 15" on an assessor's plat map) and another property ("Parcel 11" on the same map) in the area.  Defendant Power Test has owned Parcel 11, as well as another nearby property known as "Parcel 9" on the assessor's map, since 1985, when it acquired them from Texaco Refining and Marketing, Inc.

At the time LNAPL was discovered in the monitoring well, Getty Marketing was operating two pipelines running across Parcels 9 and 11 to a bulk storage tank holding fresh unleaded gasoline.  Two other pipelines traversing those parcels were capped off and filled with slurry in 1975, and have not been operated since then.  Getty Properties (or its predecessor-in-interest) has owned the pipelines on Parcels 9 and 11 since 1985.

---

vast majority of the facts set forth in Getty Marketing's statement of undisputed facts, but states, "[d]iscovery is ongoing and therefore Plaintiffs are unable to respond."  The local rules do not contemplate that sort of "non-response," see id., and, while the Federal Rules of Civil Procedure authorize relief to a party responding to a summary judgment motion who "cannot present facts essential to justify its opposition," that relief requires that non-movant to show why "by affidavit or declaration" and "for specified reasons."  Fed. R. Civ. P. 56(d).  The plaintiffs have not attempted to do so.  Instead, they have filed an opposition to Getty Marketing's motion for summary judgment, waiving their right to relief under Rule 56(d).  See Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 282 n.7 (1st Cir. 2006).  Accordingly, the court has treated as undisputed any fact in Getty Marketing's factual statement as to which the plaintiffs have claimed an inability to respond.  See L.R. Civ. 56(a)(3).

In February 1997, Getty Properties began leasing Parcels 9 and 11, and the pipelines, to Getty Marketing under a written "Master Lease" agreement that was subsequently amended and restated in November 2000, as well as an integrated "Environmental Agreement."  Both the Master Lease and the Environmental Agreement provide that New York law governs their interpretation. Getty Marketing used the two active pipelines on Parcels 9 and 11 from March 1997 until April 2003.  Both Getty Properties and Getty Marketing used the pipelines to transport unleaded refined gasoline, home heating oil, and diesel fuel only.

Following the 2002 discovery of LNAPL in the monitoring well, Getty Marketing suspended use of the pipelines.  It then excavated all of the active pipelines on Parcel 11 to check for leaks, but found no evidence of any.  After those pipelines passed pressure testing, the Rhode Island Department of Environmental Management ("DEM") granted Getty Marketing approval to resume their operation.  Testing of samples from the monitoring well, moreover, indicated the presence of a "JP-4 type aviation fluid," naptha, "weathered, leaded automotive gasoline," or "natural gasoline," which is "distinctively different from automotive gasoline."  All of these substances, in fact, are different from the undegraded automotive gasoline held in the bulk storage tank connected to the pipelines in 2002.

7

**B.    DEM proceedings**

Acting pursuant to Rhode Island's Oil Pollution Control Act, see R.I. Gen. Laws § 46-12-5.1-2, DEM issued Getty Properties a letter of responsibility, see 25-15 R.I. Code R. § 101:2.02, noting the presence of LNAPL in an abutting property's groundwater.  DEM then issued a notice of intent to enforce, see 25-1 R.I. Code R. § 3:7(a), against both of the defendants here, as well as Getty Marketing, in July 2003.  Following a site investigation and additional testing, DEM issued a notice of violation, order, and penalty, see id. § 3:7(b), against both of the defendants, as well as Getty Marketing, in July 2005.

All of these parties contested this action in an adjudicatory hearing.  See R.I. Gen. Laws § 42-17.6-4(a).  In connection with the hearing, each party was permitted to submit testimony from its designated witnesses, as well as exhibits, and to cross-examine the other parties' witnesses.  Id. § 42-17.7-5. The parties stipulated to a number of facts, including all of those just set forth.  The hearing took place over two days in May 2008.  In a lengthy written order that followed, the hearing officer adopted the parties' stipulated facts, and also made additional findings.  In re Getty Marketing Mktg., Inc., No. 05-001 (R.I. Dep't Environ. Mgmt. Dec. 23, 2009).

These findings included that:

8

(1) "[t]here is no evidence that there has been a
discharge or release of petroleum product from the
active pipelines on the site operated by [Getty
Marketing] between March 21, 1997 and April, 2003 and
operated by [Getty Properties] and its predecessors in
interest between February 1, 1985 and March 21, 1997";

(2) the defendants and Getty Marketing "did not cause
the petroleum product to be initially released onto the
subject premises"; and

(3) while "[t]he petroleum product is leaching through
the deep aquifer in and below the property owned by
[Power Test]," Getty Properties and Getty Marketing
"are not responsible for the continuing discharge."

Id. at 26 (capitalization omitted).  Based on these findings, the

hearing officer dismissed the notice of violation in its entirety

against both Getty Properties and Getty Marketing, and in part

against Power Test.  Id. at 36.  The hearing officer ruled that

it had not been proven, by a preponderance of the evidence, that

any party violated the Water Pollution Control Act or the

associated regulations, or that either Getty Properties or Getty

Marketing had violated the Oil Pollution Control Act or the

associated regulations.  Id. at 35.

The hearing officer sustained the notice of violation

against Power Test in part, ruling that its alleged violation of

the Oil Pollution Control Act and associated regulations had been

proven by a preponderance of the evidence.  Id.  Specifically,

the hearing officer found that, since the discovery of the

"leaching of petroleum onto and throughout the deep aquifer"

below its property, Power Test had not taken any action to

9

mitigate or remediate the resulting contamination, in violation of the Oil Pollution Control Act, R.I. Gen. Laws § 46-12.5.1-3, and its implementing regulations, 25 R.I. Code R. §§ 2:6, 12, at 34-3.  Id. at 33-35.  The hearing officer ruled that, under the Act, "liability can be imputed to a property owner for passive conduct for failure to remove contaminants from the groundwater under its property once discovered.  This liability is not excused by the fact that the petroleum was released by a prior owner."  Id. at 26.  As the hearing officer concluded:

> Liability for the failure to remove contaminants from the groundwater rests with the property owner.  In the pending case the property owner, [Power Test], is determined to be responsible for the violation of [the Oil Pollution Control Act] . . . .  [Getty Marketing], the operator of two pipelines that are installed in Parcels 9 and 11 is not found to be liable for the violation.

Id. at 27 (parenthetical omitted).

Power Test appealed the hearing officer's decision to the Superior Court, but its appeal challenges only its own responsibility for the discharge, rather than the hearing officer's rulings that Getty Marketing is not responsible.  Neither of the plaintiffs here was a party to any of the DEM proceedings at any stage.

## C.  Procedural history

After the hearing, but before the decision issued, the plaintiffs commenced this action against the defendants in

Providence County Superior Court.  The complaint alleged that the LNAPL on the defendants' property had caused "significant contamination" to the plaintiffs' property and that, following the discovery of the LNAPL in 2002, the defendants had failed to take any action to remediate or remove it.  Noting that the defendants were the owners of land and pipelines "from which there has been, and continues to be, a release of LNAPL" contaminating the plaintiffs' property, the complaint brought claims of nuisance, negligence, trespass, violation of the Rhode Island Water Pollution Control Act, R.I. Gen. Laws § 46-12-1 et seq., and indemnification pursuant to a written agreement between Dunellen's and Getty Properties' predecessors-in-interest.  In response, the defendants demanded that Getty Marketing defend the plaintiffs' lawsuit on the defendants' behalf, but Getty Marketing refused.  The defendants also removed the action to this court.  See 28 U.S.C. § 1441.

The defendants then brought a third-party complaint against Getty Marketing, seeking indemnification from the plaintiffs' claims under the Master Lease or, in the alternative, theories of equitable indemnification and statutory contribution.  In support of these theories, the defendants assert that Getty Marketing "has had exclusive control of the parcels 9 and 11 and the pipelines since 1997 as the tenant in possession," giving it "some or all of the liability" for the plaintiffs' claims that

release from the parcels and pipelines "are an ongoing source of contamination."  In support of the defendants' contractual indemnification claim, they assert that Getty Marketing "is responsible under the Master Lease for compliance with all laws affecting parcels 9 and 11 and the pipelines, and for all costs, fees, damages, or penalties arising out of or related to alleged LNAPL contamination of parcels 9 and 11."

Getty Marketing promptly moved for summary judgment on all of the defendants' third-party claims.  Before the defendants responded, the plaintiffs filed a second amended complaint bringing all of the same claims they originally brought against the defendants (except the contractual indemnification claim) against Getty Marketing as well.  When the defendants filed their opposition to Getty Marketing's motion for summary judgment on the third-party claims, they argued, among other things, that summary judgment would be "premature" in light of the plaintiffs' recent claims against Getty Marketing.  See infra note 6.  (The plaintiffs, for their part, filed a response to Getty Marketing's motion for summary judgment making a similar argument.)  The defendants also cross-moved for summary judgment on their claim for contractual indemnification.

In reply to both the defendants and the plaintiffs, Getty Marketing argued, among other things, that the pendency of the plaintiffs' new claims against Getty Marketing had no effect on

12

the defendants' third-party claims against Getty Marketing because the plaintiffs' claims failed as a matter of law.  Getty Marketing simultaneously filed a motion for summary judgment on the plaintiffs' claims that incorporated this argument (so that, in essence, Getty Marketing's reply memoranda on its motion for summary judgment on the defendants' claims served as its opening memorandum on its motion for summary judgment on the plaintiffs' claims).  The plaintiffs filed an opposition to this motion, and Getty Marketing filed a reply.  The case was subsequently reassigned to the undersigned.

III. **Analysis**

A.  **Summary judgment on the third-party claims**

In moving for summary judgment on the defendants' third-party claims, Getty Marketing argues that they are barred by the collateral estoppel effect of the hearing officer's findings that, while Getty Marketing did not cause the release, and is not responsible for the discharge, of petroleum product into the aquifer, Power Test is responsible for that discharge.  Getty Marketing maintains that, as a result, the defendants cannot show that (1) Getty Marketing caused any injury to the plaintiffs, which is an essential element of the equitable indemnification and contribution claims, (2) the defendants are blameless for the plaintiffs' injury, which is an essential element of the

13

equitable indemnification claim, and (3) the plaintiffs failed to comply with environmental laws, which is an essential element of Getty Properties' claim for indemnification under the Master Lease.  Getty Marketing further argues that the defendants' contractual indemnification claim fails as a matter of law in any event because the Master Lease imposes no liability on Getty Marketing "for contamination that it did not cause and which arose prior to the commencement date of the lease."  In cross-moving for summary judgment on that claim, the defendants argue that the Master Lease unambiguously requires Getty Marketing to indemnify Getty Properties against the plaintiffs' claims so that, by refusing to do so, Getty Marketing has indisputably breached the agreement.

As explained fully below, the court agrees with Getty Marketing, both as to the collateral estoppel effect of the hearing officer's findings and the interpretation of the Master Lease and Environmental Agreement.  First, the hearing officer's findings that Getty Marketing is not liable for failing to remediate the contamination on parcels 9 and 11--but that Power Test is--collaterally estop the defendants from obtaining indemnification (or contribution from) Getty Marketing against the plaintiffs' claims against the defendants, which arise out of that very same failure to remediate.  Second, and independently, the Environmental Agreement expressly relieves Getty Marketing of

14

any responsibility to remediate any condition on the property that was non-compliant with environmental laws as of the effective date of the restated Master Lease--and the defendants do not question that the LNAPL contamination on parcels 9 and 11 is just such a condition.

### 1.   Indemnification under the Master Lease

### a.   Section 9.2

In sparring over the scope of Getty Marketing's indemnification liability under the Master Lease, the parties focus largely, though not exclusively, on section 9.2.  That section, under the heading "Environmental Matters," states:

> <u>Tenant Obligations</u> . . . .  Tenant shall, except as provided in Section 25.3, be solely responsible, at its own cost and expense, for compliance with all Environmental Laws applicable to the Premises after the Commencement Date of the 1997 Master Lease.

The Commencement Date of the 1997 Master Lease is February 1, 1997.  The Master Lease defines "Environmental Law" to include, among other things, "all laws, ordinances, requirements, orders, directives, rules, regulations, and applicable judicial and administrative decisions . . . affecting the . . . use, maintenance, operation or occupancy of . . . any part of any Property," including "Laws related to the release or discharge of Hazardous Substances to . . . groundwater . . . in, on, at, to or from . . . any Property, or any part of any Property."

As an initial matter, while the defendants rely heavily on section 9.2 in support of their contractual indemnification claim, they also advance a construction of the Master Lease that seems to undermine that support.  As the defendants recognize, while section 9.2 makes Getty Marketing solely responsible for complying with all environmental laws applicable to the property following the onset of the lease, that responsibility is subject to the exception provided in section 25.3.  Under that section, which is entitled "Violation of Environmental Law,"

> In the event that any violation of Environmental Law exists with respect to any property as of [December 8, 2000][3] whether or not any party shall have received notice or otherwise become aware of such violation (such violation being referred to herein as a "Preexisting Environmental Violation") the following provisions shall apply.  The mere existence of any such Preexisting Environmental Violation shall not cause Tenant to be in default under this Restated Lease. Landlord's and Tenant's obligations shall be set forth elsewhere in this Restated Lease and in the Environmental Agreement.

---

[3]Section 25.3 states this date as the "Restatement Effective Date," which is defined as "the initial acceptance for payment of shares of Company Common Stock pursuant to the Offer" (parentheticals omitted).  These terms are references to the merger agreement between, among other parties, Getty Marketing and Lukoil (the Russian oil concern).  While the parties have not provided the merger agreement to the court, Getty Marketing's filings with the Securities and Exchange Commission indicate that Lukoil accepted Getty Marketing's tender of shares on or about December 8, 2000.  In quoting various sections of the Master Lease in this order, then, the court has therefore substituted this date in for the term "Restatement Effective Date."

Thus, as the defendants acknowledge, Getty Marketing cannot "be declared in default due to a pre-existing violation of environmental laws" at the property, which are dealt with not by section 9.2, but "by other provisions in the Master Lease and Environmental Agreement." The defendants also do not question that the presence of LNAPL on parcels 9 and 11 is a "Preexisting Environmental Violation": to the contrary, they state that "[t]he LNAPL apparently originates from an ancient discharge or discharges . . . long before [Getty Properties, Power Test, or Getty Marketing] owned or operated the Property."

The defendants do not explain how, in light of their explicit or tacit agreement that, first, section 9.2 does not impose any liability on Getty Marketing for pre-existing environmental violations, and, second, that the presence of LNAPL on the property is a pre-existing environmental violation, the defendants are nevertheless entitled to indemnification from Getty Marketing under section 9.2 for remediating the LNAPL contamination on the property. The lack of such an explanation would seem fatal to the defendants' contractual indemnification claim insofar as it is based on section 9.2 of the Master Lease, even putting aside Getty Marketing's argument that the defendants are collaterally estopped from bringing such a claim.

In any event, that argument is correct, even assuming, dubitante, that Getty Marketing's failure to remediate the LNAPL

17

contamination at the property could entitle the defendants to
indemnification under section 9.2 (on the theory that this is a
violation of environmental law under that provision, but not a
pre-existing environmental violation under section 25.3).  To
hold Getty Marketing responsible for the plaintiffs' claims
against the defendants, the defendants would have to show that
those claims arise out of Getty Petroleum's failure to comply
with environmental law applicable to the property after February
1, 1997.  But the defendants cannot make that showing, on account
of the hearing officer's findings that Getty Marketing did not
cause the initial discharge, and is "not responsible for the
continuing discharge," of LNAPL from parcels 9 and 11 (since
those discharges are the only violations of environmental law
alleged by the defendants).

"Under federal law, a state court judgment receives the same
preclusive effect as it would receive under the law of the state
in which it was rendered."  Dillon v. Select Portfolio Servicing,
630 F.3d 75, 80 (1st Cir. 2011).  Rhode Island law provides that,
"[e]xcept where application of the doctrine would produce
inequitable results, collateral estoppel operates to bar the
relitigation of an issue when:  (1) the party against whom
collateral estoppel is sought is the same or in privity with the
party in the previous proceeding; (2) the previous proceeding
resulted in a final judgment on the merits; and (3) there is an

18

identity of issues." Cronan v. Iwon, 972 A.2d 172, 174-75 (R.I. 2009).  Under Rhode Island's collateral estoppel doctrine, then, "an issue of ultimate fact that has been actually litigated and determined cannot be re-litigated between the same parties or their privies in future proceedings."  Foster-Glocester Reg'l Sch. Comm. v. Bd. of Review, 854 A.2d 1008, 1014 (R.I. 2004) (quotation marks omitted).

The defendants do not contest that they were parties to the DEM proceedings before the hearing officer.  Nor do they contest that those proceedings, in which each party was permitted to submit testimony from its own witnesses and cross-examine the other's, concluded with a final judgment on the merits entitled to preclusive effect.[4]  See Dep't of Corr. v. Tucker, 657 A.2d 546, 559 (R.I. 1995) ("an adjudicative determination will be conclusive as long as the administrative tribunal grants to the parties substantially the same rights as they would have if the matter were presented to a court") (citing Restatement (Second) of Judgments § 83 (1982)).  Instead, the defendants argue that there is no identity of issues between this action and the DEM proceedings, because the parties to those proceedings "never

_____

[4]While, as noted supra, the defendants have appealed the hearing officer's decision to the Superior Court, they have not appealed his findings that Getty Marketing is not responsible for the continuing discharge and, in any event, "[a] judgment may be given res judicata effect even though that judgment is subject to an appeal."  Silva v. Silva, 404 A.2d 829, 832 (R.I. 1979).

litigated the question of which of them, if any, is responsible for damages allegedly caused by leaching of LNAPL-contaminated groundwater onto [the plaintiffs'] property."

As the defendants acknowledge in a footnote to their summary judgment memorandum, however, the hearing officer specifically found that Getty Marketing "did not cause the petroleum product to be initially released onto" parcels 9 and 11 and is "not responsible for the continuing discharge" of petroleum product into the aquifer below the property. In re Getty Marketing Mktg., Inc., slip op. at 26. The hearing officer also specifically found that "[l]iability for the failure to remove contaminants from the groundwater rests with the property owner," Power Test, rather than with "the operator of two pipelines that are installed" at the property, Getty Marketing. Id. at 27.

In a single sentence in the same footnote, the defendants state that these conclusions are solely "based on the statutes relied upon by" the hearing officer, who therefore did not determine "whether [Getty Properties] caused a continuing discharge for purposes of a negligence, trespass, nuisance or other common law claim by an abutter such as" the plaintiffs. A party cannot avoid summary judgment through this sort of inadequately developed argument. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999). In any

20

event, as best as this court can understand the defendants'
point, it is without merit.

Again, the hearing officer found that "[l]iability for the
failure to remove contaminants from the groundwater rests with"
Power Test and not with Getty Properties, even though neither of
them caused the contamination.  The fact that the hearing officer
came to this conclusion in deciding statutory claims against
Getty Properties for its alleged failure to decontaminate the
groundwater does not diminish the preclusive effect of that
finding in this action simply because it includes common-law
claims against Getty Properties for the same thing.  "The
doctrine of collateral estoppel makes conclusive in a later
action on a different claim the determination of issues that were
actually litigated in the first action."  E.W. Audet & Sons, Inc.
v. Fireman's Fund Ins. Co. of Newark, N.J., 635 A.2d 1181, 1186
(R.I. 1994) (emphasis added).  The defendants do not dispute that
Getty Marketing's liability for the continuing discharge of
petroleum into the groundwater beneath parcels 9 and 11 was
actually litigated before, and determined by, the hearing
officer, who found that Getty Marketing was not liable.  The
defendants cannot avoid the preclusive effect of that finding by
relying on different claims or theories of liability against
Getty Marketing.  Again, because collateral estoppel bars the
relitigation of "issues that actually were decided in the prior

21

lawsuit, it may even apply when the second lawsuit asserts a different <u>claim</u>."  <u>Plunkett v. Rhode Island</u>, 869 A.2d 1185, 1188 (R.I. 2005) (emphases added).[5]

Pointing out that the hearing officer's findings do not bind the plaintiffs, who were not parties to the DEM proceedings, the defendants say that if the plaintiffs "were to succeed in proving a release from the active pipelines [on parcels 9 and 11] after 1997, when [Getty Marketing] took control of them, it would be a material change of circumstances and collateral estoppel would not bar [the defendants] from suing [Getty Marketing] for contribution and indemnification."  Of course, the hearing officer specifically found that no such release had occurred, <u>In re Getty Marketing Mktg., Inc.</u>, slip op. at 26, and, for the reasons just discussed, that finding collaterally estops the defendants, who were parties to the DEM proceedings, from arguing otherwise.  While the defendants cite a case where the court of appeals "acknowledged that changed circumstances may defeat collateral estoppel," that case actually rejected a "changed circumstances" argument, <u>Ramallo Bros. Printing, Inc. v. El Dia, Inc.</u>, 490 F.3d 86, 90-91 (1st Cir. 2007), and the defendants offer nothing else to support such an argument here.  Like their

---

[5]This principle also disposes of the defendants' suggestion that the hearing officer's findings are not entitled to preclusive effect here because the parties there "did not file any cross claims" against each other.

other argument against giving collateral estoppel to the hearing officer's findings, then, their "changed circumstances" argument is insufficiently developed and therefore safely ignored.  <u>See</u> <u>Higgins</u>, 194 F.3d at 260.

Even putting that aside, though, the plaintiffs have essentially disclaimed any theory that an LNAPL release occurred during Getty Marketing's control of the pipelines:  in their response to Getty Marketing's motion for summary judgment on the plaintiffs' claims, they say that "for the purposes of [those claims], whether or not [Getty Marketing] caused the initial release of LNAPL is irrelevant."  So, even if "changed circumstances" included the possibility that a non-party to the prior proceeding might prevail on a claim that the parties to that proceeding are estopped from relitigating--and, again, the defendants have provided nothing to support that notion as a matter of law--there is no realistic possibility of that here, at least as regards a claim that LNAPL was discharged from the pipelines during Getty Marketing's tenancy, because the plaintiffs do not appear to be pressing that claim.[6]

---

[6]In a similar vein, the defendants argue that deciding their third-party claims against Getty Marketing before deciding the plaintiffs' claims against Getty Marketing would be "premature" in that it would expose the defendants to "the possibility of inconsistent results:  being held liable to [the plaintiffs] after [Getty Marketing] has been granted judgment on the third-party claims."  The court sees nothing "inconsistent" in a scenario where a defendant is held liable to a plaintiff but

Accordingly, the hearing officer's findings that Getty Marketing did not cause the initial discharge, and is not responsible or liable for the continuing discharge, of LNAPL on parcels 9 and 11 bar the defendants from relitigating Getty Marketing's liability for failing to remediate the continuing discharge in this action.  Aside from that alleged failure--the very omission for which the hearing officer specifically found Getty Marketing not liable--the defendants do not claim that Getty Marketing has, through action or inaction, violated any "Environmental Laws applicable to the Premises after the Commencement Date" so as to breach section 9.2 of the Master Lease.  It follows that the defendants are collaterally estopped from using Getty Marketing's alleged breach of section 9.2 as the basis of their claim for indemnification under the Master Lease.

### b.   Other sections of the Master Lease

The defendants suggest that they are entitled to indemnification from Getty Marketing under other provisions of the Master Lease.  As Getty Marketing points out, however, the defendants merely quote various sections of those documents, highlighting certain phrases, without explaining how these

---

cannot get indemnification against that liability from a third party.  In any event, through this order, the court is in fact simultaneously granting summary judgment to Getty Marketing on both the defendants' third-party claims and the plaintiffs' direct claims, avoiding any possible "inconsistency."

24

provisions require Getty Marketing to indemnify Getty Properties against the plaintiffs' claims against the defendants (which, as just noted, arise solely out of the failure to remediate the continuing discharge of petroleum into the groundwater beneath the property).  This is problematic, because "[a] party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly."  Higgins, 194 F.3d at 260. In any event, the court cannot see how any of these provisions supports the defendants' contractual indemnification claim.

The defendants cite certain provisions of section 10 of the Master Lease, entitled "Indemnification:  Liability of Landlord." Section 10.1, entitled "Mutual Indemnity Obligations," provides:

> Landlord and Tenant shall each Indemnify the other
> against (a) any wrongful act, wrongful omission, or
> negligence of the Indemnitor; and (b) any breach or
> default by the Indemnitor under this Restated Lease or
> the Environmental Agreement.  In addition to and
> without limiting the generality of the foregoing
> indemnity, Tenant shall Indemnify Landlord . . .
> against all the following matters (except to the extent
> any claim arises from any wrongful act, wrongful
> omission or negligence of Landlord . . .) relating to
> (t) . . . breach of Tenant's obligations to comply with
> Environmental Laws pursuant to Section 9.2; (u) the
> operation or occupancy of any Property; . . . [and]
> (x) the condition of any Property or of any street
> . . . adjoining such Property, whether or not such
> condition existed before [December 8, 2000] . . . .
> Notwithstanding anything to the contrary in the
> foregoing, neither party shall be required to Indemnify
> the other party from or against such other party's
> intentional acts or negligence.

Again, while the defendants quote these provisions, setting some of them off in bold typeface, they do not explain which of the many specific provisions within this section entitles them to indemnification from Getty Marketing against the plaintiffs' claims, and that proposition is not apparent to the court.

First, the defendants emphasize clause (b), which requires Getty Marketing to indemnify them against "any breach or default by [Getty Marketing] under this Restated Lease or Environmental Agreement."  But the defendants do not explain how Getty Marketing's failure to remediate contamination on the property amounts to a breach or default of any particular provision of either agreement.  Again, as discussed supra, the defendants appear to concede that this is not a breach of section 9.2, and they are collaterally estopped from showing that it is anyway. This reasoning applies with equal force to the defendants' suggestion that they are entitled to indemnification under clause (t), which requires Getty Marketing to indemnify them against matters relating to "breach of the Tenant's obligations to comply with Environmental Laws pursuant to Section 9.2."

Second, the defendants quote clauses (u) and (x), which require Getty Marketing to indemnify the defendants against matters relating to "the operation or occupancy of any Property" and "the condition of any Property . . . whether or not such condition existed before" the effective date of the restated

Master Lease.  While the plaintiffs' claims against the
defendants for continued LNAPL contamination appear to fit within
these provisions, neither they nor any other clause of section
10.2 applies "to the extent any claim arises from any wrongful
act, wrongful omission or negligence of Landlord."  The
defendants simply ignore this limiting language, which is fatal
to any claim for indemnification under clause (u) or (x) or, for
that matter, any clause of section 10.1.[7]

The plaintiffs' claims against the defendants arise out of
the allegedly wrongful acts, omissions, and negligence of both
Power Test and Getty Properties in, among other things, allowing
the LNAPL releases from parcels 9 and 11 to continue.  Indeed,
the hearing officer specifically found that Power Test, as the
owner of those parcels, was liable under the Rhode Island Oil
Pollution Control Act for failing to take any action to remediate
the leaching of petroleum into the aquifer below parcels 9 and
11.  In re Getty Marketing Mktg., Inc., slip op. at 33-35.  The
defendants do not question that this failure was a "wrongful
omission," or that it is the very same "wrongful omission" out of
which the plaintiffs' claims against them arise (again, they
simply ignore the final sentence of section 10.1 and the

---

[7]This includes clause (a), which appears in the portion of
section 10.1 quoted by the defendants, but to which they do not
otherwise call attention.

limitation it places on both parties' indemnification obligations under the Master Lease).  So, given the hearing officer's finding against Power Test--which, just like his findings in favor of Getty Marketing, has preclusive effect here--the defendants are not entitled to indemnification against the plaintiffs' claims under clauses (u) and (x) of section 10.1.  See Doralee Est. v. Cities Serv. Oil Co., 569 F.2d 716, 719-20 (2d Cir. 1977) (ruling that, based on prior judicial finding that landlord failed in its obligations to abate oil pollution on its property, it was not entitled to indemnification from tenant under hold harmless clause in lease) (applying New York law).

The defendants also quote Section 10.2, entitled "Liability of Landlord," which states in relevant part that

> Except with respect to the obligations of Landlord pursuant to the Environmental Agreement . . . , Tenant shall be deemed to be in exclusive control and possession of the Premises during the Term as provided in this Restated Lease.  Landlord shall not be liable for any injury or damage . . . to any person occurring on or about any Property nor for any injury or damage to any property of Tenant, or of any other person, during the Term, unless caused by Landlord's . . . wrongful acts and/or omissions or acts of negligence or a breach of Landlord's obligations under this Restated Lease . . . .  The provisions of this Restated Lease permitting Landlord to enter and inspect any Property . . . shall not be construed to impose upon Landlord any obligation, liability, or duty to third parties, but nothing in this Restated Lease shall be construed to exculpate, relieve, or Indemnify Landlord from or against any obligation, liability or duty of Landlord to third parties existing at or before the applicable Commencement Date [of February 1, 1997] or its

28

> obligations arising under . . . the Environmental
> Agreement.

The defendants suggest that this section entitles them to
indemnification from Getty Marketing against the plaintiffs'
claims, which seek to recover damages that "occurred during the
term of the lease, as they arise out of LNAPL contamination
discovered in 2002."

As they do with section 10.1, however, the defendants simply
ignore the limiting language of section 10.2, which relieves them
of liability for such damages "unless caused by Landlord's . . .
wrongful acts and/or omissions or acts of negligence."  As just
discussed, the plaintiffs claim injury from the nonfeasance of
the defendants, as well as that of Getty Marketing, in failing to
remediate contamination at the property, and the hearing officer
found Power Test liable for precisely that nonfeasance.

Just like section 10.1's indemnification provisions, then,
section 10.2's exculpatory provision does not shift liability for
the plaintiffs' claims against the defendants to Getty Marketing,
since those claims seek to recover for injury caused, at least in
part, by the defendants' wrongful acts.  Cf. Hogeland v. Sibley,
Lindsay & Curr Co., 366 N.E.2d 263, 265-67 (N.Y. 1977) (ruling
that lease provision requiring tenant to indemnify landlord
applied to third-party claim arising in part out of landlord's
negligence, despite exculpatory clause that "nothing in this

29

lease shall be construed to relieve the Landlord from responsibility to the Tenant for any loss or damage caused the Tenant wholly in part by the negligent acts or omissions of the Landlord," because this clause "relate[d] only to loss or damage [landlord] might occasion directly to [tenant]").  Again, the defendants do not even acknowledge this exception to section 10.2, let alone provide any reasoned argument as to why it does not apply here.  That is fatal to any claim for indemnification under section 10.2.

    **c.  Environmental Agreement**

      Finally, the defendants rely on section IV.2 of the Environmental Agreement.  Like their reliance on section 25.3 of the Master Lease, however, this appears to undermine, rather than support, their contractual indemnification claim.  Section IV.2 of the Environmental Agreement provides that,

> <u>notwithstanding anything to the herein, in the Restated</u>
> <u>Master Lease, or in any other agreement</u>, any condition
> not in full compliance with any Environmental Law as of
> [December 8, 2000] at any . . . Petroleum Terminal
> Property shall not operate as a lease default and
> Tenant shall have no liability or obligation whatsoever
> to engage in any Remediation or any other compliance-
> related activity with respect to any such non-
> compliance condition . . . except when required by a
> bona fide claim asserted by . . . a party other than
> Landlord.  Tenant shall not be required by a bona fide
> claim to take action if Tenant has a reasonable, good
> faith basis for asserting such a challenge or defense
> and if Tenant is, in fact, diligently challenging or
> defending against such Claim.

(emphasis added).  Just as they do not question that the presence of LNAPL on the property is a "Preexisting Environmental Violation" under section 25.3 of the Master Lease, the defendants also do not question that it is a "condition not in full compliance with Environmental Law as of December 8, 2000" under section IV.2 of the Environmental Agreement.  Accordingly, whatever obligations sections 9.2, 10.1, or 10.2 of the Master Lease might impose upon Getty Marketing, by way of indemnification or otherwise, it "shall have no liability or obligation to engage in any Remediation or any other compliance-related activity with respect to" the presence of LNAPL on the property.  But it is precisely such liability that the defendants seek to impose upon Getty Marketing by demanding indemnification from the plaintiffs' claims against the defendants for failing to remediate the LNAPL contamination from the property.

In resisting this conclusion, the defendants point out that, under section IV.2 of the Environmental Agreement, Getty Marketing does have the obligation to remediate pre-existing environmental violations "when required by bona fide Claim asserted by . . . a party other than Landlord."  The defendants argue that the plaintiffs' claims against Getty Properties in this action fit that description.  Assuming for the moment that the plaintiffs' claims, even in their disputed state, "require" Getty Marketing to remediate the LNAPL contamination at the

31

property, it does not follow that those claims also obligate
Getty Marketing to provide indemnification from the plaintiffs'
claims against the defendants for their own alleged failure to
engage in such remediation.  That is not what section IV.2
provides.  To the contrary, it specifically provides that Getty
Marketing's obligation to remediate pre-existing environmental
violations must be triggered by a claim by "a party other than
Landlord."  The defendants' indemnification claim, of course, is
a claim by the landlord--and, as a result, cannot obligate Getty
Marketing to remediate pre-existing environmental violations on
the property, even if the plaintiffs' own claims against Getty
Marketing ultimately could.

Furthermore, even if third-party claims that required Getty
Marketing to remediate pre-existing environmental violations on
the property did, as the defendants suggest, obligate it to
provide indemnification against claims against them seeking the
same relief, the plaintiffs' claims against Getty Marketing do
not yet "require" it to do that.  To be sure, that is part of the
relief the plaintiffs seek, but section IV.2 does not, by its
terms, obligate Getty Marketing to remediate pre-existing
environmental violations simply because a third-party claim seeks
to require it to do so:  Getty Marketing must be "required" by
the claim to do so.  Indeed, the final sentence of section IV.2
specifically provides that Getty Marketing "shall not be required

by a bona fide Claim to take action if [it] has a reasonable, good faith basis for asserting a challenge or defense and if Tenant is, in fact, diligently challenging or defending against such claim." Getty Marketing is challenging and defending the plaintiffs' claims against it here (it has filed an answer denying liability for those claims, as well as a motion for summary judgment on them), and the defendants do not dispute that it has a "reasonable, good faith basis for doing so."[8]

Instead, just as they do with the language of sections 10.1 and 10.2 of the Master Lease unfavorable to their position, the defendants simply ignore this portion of section IV.2 of the Environmental Agreement, going so far as to omit it from the block quotation of this provision that appears in their summary judgment memorandum. The defendants cannot engage section IV.2, however, by ignoring part of it. The fact that Getty Marketing, in good faith, is diligently challenging and defending the plaintiffs' claims is itself fatal to the defendants' suggestion that section IV.2 of the Environmental Agreement entitles them to indemnification from the plaintiffs' claims against them.

More importantly, though, section IV.2 expressly states that, with respect to "any condition not in full compliance with

---

[8]Indeed, as discussed _infra_ at part III.B, the court rules that Getty Marketing's challenge to the plaintiffs' claims is not only reasonable, but correct as a matter of law, and grants summary judgment to Getty Marketing on those claims.

any Environmental Law" as of December 8, 2000, Getty Marketing

"shall have no liability or obligation whatsoever to engage in

any Remediation or any other compliance-related activity," and

that this rule governs "[n]otwithstanding anything to the

contrary" in the Environmental Agreement or Master Lease.  It is

exceedingly difficult to read this provision as doing anything

else but relieving Getty Marketing of liability for environmental

violations on the property that existed before that date (unless,

as just discussed, a third-party claim imposes such liability).

The defendants do not offer any other reading of section IV.2,

nor, as stated several times already, do they question that the

LNAPL contamination on the property was a "condition not in full

compliance with any Environmental Law" as of December 8, 2000.[9]

---

[9]Instead, the defendants rely heavily on an unpublished
letter opinion by a New Jersey trial court interpreting the
Master Lease to require Getty Marketing to indemnify Power Test
against claims of pre-existing environmental violations
(specifically, underground storage tanks) at a different
property.  N.J. Sch. Constr. Corp. v. Power Test Realty Corp.,
No. UNN-L-4009-06 (N.J. Super. Ct. Civ. Div. Aug. 25, 2009),
appeal dismissed, 2012 WL 1537296 (N.J. Super. Ct. App. Div. May
3, 2012).  This court does not find the letter opinion
instructive here.  First, in requiring Getty Marketing to
indemnify Power Test against those claims, the court applied a
section of the Master Lease that specifically allocates
responsibility for underground storage tanks.  Id. at 7.  There
is no allegation here, by either the plaintiffs or the
defendants, that the contamination on parcels 9 and 11 emanated
from underground storage tanks.  Second, after ruling that the
Master Lease was ambiguous as to which party was ultimately
responsible for the violations, the New Jersey court relied on
testimony from two witnesses "involved in the drafting or
execution of the master lease," finding their testimony that

Thus, even if the defendants could show that some provision of the Master Lease entitles them to indemnification from Getty Marketing against the plaintiffs' claims for failing to remediate the LNAPL pollution at the property, section IV.2 of the Environmental Agreement trumps, and prevents the defendants from shifting that liability to Getty Marketing.  Getty Marketing is entitled to summary judgment on the defendants' contractual indemnification claim.  Conversely, the defendants' motion for summary judgment on that claim is denied.[10]

---

(aside from underground storage tanks at other specified properties) Getty Marketing was "responsible for all other environmental conditions, even those arising from an unknown release . . . to be credible and in accordance with a fair and reasonable reading of the lease." Id. at 8.  Here, neither party has argued that the Master Lease is ambiguous such that it would be appropriate for this court to consider such testimony, nor have they offered any (aside from excerpts of testimony that Getty Marketing's chief operating officer gave the New Jersey court in which he demonstrated an inability to point to a particular provision of the Master Lease relieving his company of liability for pre-existing environmental violations, but this court is at a loss to see how that affects the meaning of the parties' agreements, particularly where, again, there is no suggestion they are ambiguous).  Third, while the New Jersey court did not expressly consider section IV.2 of the Environmental Agreement, it relied on the fact that the state's Department of Environmental Management had ordered Getty Marketing to remediate the contamination on the property, id. at 8 (which, as just discussed, would have amounted to bona fide claim requiring Getty Marketing to carry out that remediation).  The opposite, of course, happened here.

Importantly, the defendants do not argue that the New Jersey opinion has any preclusive effect here, so this court has not considered that possibility.

[10]In support of that motion, the defendants quote, in a parenthetical, a portion of section 4.1 of the Master Lease,

**2.    Indemnification/contribution under Rhode Island law**[11]

Getty Marketing also seeks summary judgment on the
defendants' claims for common-law indemnification and for
contribution under Rhode Island's version of the Uniform
Contribution Among Tortfeasors Act, R.I. Gen. Laws § 10-6-3.
Under Rhode Island law, "there are three elements to a claim for
equitable indemnity . . . .  first, the party seeking indemnity
must be liable to a third party, second, the prospective
indemnitor must also be liable to the third party, and, third, as

---

stating that "Tenant shall pay as Additional Rent and discharge
. . . each and every item of expense, of every kind and nature
whatsoever, related to or arising from the Premises, or by reason
of or in any manner connected with or arising from the
development, leasing, operation, management, repair, use or
occupancy of the Premises or any Property or any portion
thereof."  But this provision is subject to several exceptions
which the defendants, true to form, omit from their quotation.
First, it does not apply to "legal . . . and other similar costs
incidental to Landlord's ownership of its fee or leasehold
interest in any Property, other than Legal Costs that Tenant has
expressly agreed to pay" (because the defendants ignore this
exception, they do not point to any express agreement elsewhere
in the lease for Getty Marketing to pay the defendants' costs of
defending against third-party environmental claims).  Second, and
more importantly, section 4.1 applies only "except as
specifically set forth to the contrary in this Restated Lease"
and does not apply to "the obligations of Landlord set forth in
. . . the Environmental Agreement" (section IV.2 of which, by its
own terms, controls notwithstanding anything to the contrary in
the Master Lease).  Insofar as the defendants have even properly
raised section 4.1 in support of their contractual
indemnification claim, then, it does not help them.

[11]Despite the provisions for New York law in the Master
Lease and Environmental Agreement, the parties agree that Rhode
Island law governs the defendants' claims for common-law
indemnification and for contribution.

between the prospective indemnitor and indemnitee, equity requires the obligation to be discharged by the potential indemnitor." Wilson v. Krasnoff, 560 A.2d 335, 341 (R.I. 1989). "One situation satisfying this third element is when a potential indemnitor is at fault and the prospective indemnitee is blameless." Id.

In moving for summary judgment on the defendants' common-law indemnification claim, Getty Marketing argues that, inter alia, the defendants cannot show they are "blameless" in light of the hearing officer's finding that Power Test is liable for failing to remediate the LNAPL contamination on its property.  In response, the defendants argue that "it is premature to state that [Power Test] cannot prove it is blameless because [the hearing officer's] decision may be reversed on appeal."  As already noted, however, the fact that a judgment has been appealed does not diminish its preclusive effect under Rhode Island law. See note 4, supra.  Because the hearing officer's finding against Power Test collaterally estops the defendants from showing they are blameless on the plaintiffs' claims, Getty Marketing is entitled to summary judgment on the defendants' claim for common-law indemnification against those claims.[12]

---

[12]While, as Wilson suggests, there are other situations, aside from the indemnitee's blamelessness, under which "equity requires the obligation to be discharged by the potential indemnitor," the defendants do not identify any.  Instead, they

The hearing officer's findings likewise estop the defendants from prevailing on their contribution claim. While "[t]he right of contribution exists among joint tortfeasors" under Rhode Island's version of the Uniform Contribution Act, R.I. Gen. Laws § 10-6-3, "'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property," id. § 10-6-2. As already discussed at length, the hearing officer's finding that Getty Marketing is not liable for failing to remediate the LNAPL contamination at the defendants' property, In re Getty Marketing Mktg., Inc., slip op. at 27, precludes the defendants from making the contrary showing that Getty Marketing is in fact liable for that contamination, see Part III.A.1, supra. As also already discussed, the preclusive effect of that finding on the defendants is undiminished by its lack of preclusive effect on the plaintiffs, who, unlike the defendants, were not parties to the DEM proceedings. See id.

_____

argue that the hearing officer's findings are not "determinative of whether [Getty Marketing] is blameless for [the plaintiffs'] alleged damages." The court disagrees (for the reasons explained at Part III.A.1, supra, the findings that Getty Marketing is not responsible for remediating the contamination at the property are binding on the defendants) but, in any event, the defendants cannot prevail on their common-law indemnification claim simply by proving that Getty Marketing is not blameless. They must also prove that they are blameless, which the hearing officer's contrary finding precludes them from doing. (While the hearing officer found that only Power Test, and not Getty Properties, was liable for failing to remediate the contamination, that liability ultimately belongs to Getty Properties as Power Test's general partner. See note 1, supra.)

Because the defendants are estopped from showing that Getty Marketing is "liable in tort" for the contamination to the plaintiffs' property, Getty Marketing is entitled to summary judgment on the contribution claim.

**B.    Summary judgment on the plaintiffs' claims**

Getty Marketing has also moved for summary judgment on all of the plaintiffs' claims against it set forth in the second amended complaint:  nuisance, negligence, trespass, and violation of the Rhode Island Water Pollution Control Act, R.I. Gen. Laws § 46-12-21.  As to the plaintiffs' common-law claims, Getty Marketing argues that, because it had no knowledge of the LNAPL contamination at the time it began its tenancy over parcels 9 and 11 and their pipelines, it can have no liability to adjacent landowners like the plaintiffs for failing to remediate the contamination, under a theory of negligence, nuisance, or trespass.  Getty Marketing argues that it has no liability under the Water Pollution Control Act either because (a) there is no evidence that LNAPL was discharged onto the property prior to the 1980 effective date of the Act, which does not apply retroactively, and (b) in any event, there is also no evidence that Getty Marketing "negligently or intentionally pollute[d] groundwater" so as to violate the Act.

39

As fully explained below, no Rhode Island court appears to have considered whether contamination on leased premises, existing at the commencement of the tenancy, exposes the tenant to common-law liability to adjacent landowners simply because the contamination was not discovered until the tenancy commenced. Indeed, the plaintiffs have not provided (nor has this court's research uncovered) a single case from any jurisdiction imposing common-liability under these circumstances.  So this court, sitting in diversity, declines to recognize that novel theory of liability here, and grants summary judgment for Getty Marketing on the plaintiffs' common-law claims.  The plaintiffs do not even address Getty Marketing's argument that their Water Pollution Control Act claim fails for the lack of evidence that they in fact polluted groundwater, so the court grants summary judgment for Getty Marketing on that claim as well.

## 1.  Common-law claims

As already noted, the plaintiffs have disavowed any claim that Getty Marketing caused the release of LNAPL damaging their property, or even that the release occurred during Getty Marketing's tenancy.  See Part III.A.1, supra.  Instead, the plaintiffs argue that, regardless of when the release occurred, Getty Marketing has a common-law "duty to abate [it] because [Getty Marketing] learned about the contamination at least over

eight years ago and it has control over the . . . property from
which the LNAPL still flows" (footnote omitted).  Again, though,
the plaintiffs have not come forward with a case--from Rhode
Island or otherwise--imposing common-law liability on a tenant to
a neighboring landowner for contamination on the premises that
existed prior to the commencement of the tenancy, and this
court's research has not turned up any.

Where, as here, state law provides the rules of decision in
a case in this court, it must "interpret[] and apply[] the rules
of substantive law enunciated by the state's highest judicial
authority, or, on questions to which that tribunal has not
responded, making an informed prophecy of what the court would do
in the same situation." Blinzler v. Marriott Int'l, Inc., 81
F.3d 1148, 1151 (1st Cir. 1996) (footnote omitted).  To do so,
this court may "seek guidance in analogous state court decisions,
persuasive adjudications by courts of sister states, learned
treatises, and public policy considerations identified in state
decisional law." Id.  But "[a] federal court sitting in
diversity must take care not to extend state law beyond its well-
marked boundaries" and "exercise considerable caution when
considering the adoption of a new application of state law that
could expand its present reach." Braga v. Genlyte Group, Inc.,
420 F.3d 35, 42 (1st Cir. 2005) (quotation marks omitted).
Honoring these principles, this court cannot say that Rhode

Island tort law would recognize the plaintiffs' common-law claims against Getty Marketing.

### a. Trespass

In support of their trespass claim, the plaintiffs rely solely on section 161(2) of the <u>Restatement (Second) of Torts</u>. That reliance, however, is misplaced.  Under section 161(2),

> trespass may be committed by the continued presence on the land of a . . . thing which the actor's predecessor in legal interest therein has tortiously placed there, if the actor, having acquired his legal interest in thing with the knowledge of such tortious conduct or having thereafter learned of it, fails to remove the thing.

<u>Restatement (Second) of Torts</u> § 161(2) (1977).

Assuming, without deciding, that the LNAPL contaminating the plaintiffs' property amounts to a "thing . . . tortiously placed there" under this rule, it still fails to accommodate the plaintiffs' trespass theory because they have not alleged, let alone come forward with any evidence, that this was perpetrated by Getty Marketing's "predecessor in legal interest therein." Indeed, the plaintiffs make no attempt to identify who "placed" the LNAPL on their property, let alone any relationship between that person and Getty Marketing.  Nor do they provide any other authority or reasoned argument to support their trespass theory. Getty Marketing is entitled to summary judgment on that claim.

**b.   Nuisance and negligence**

As the plaintiffs point out, Rhode Island law recognizes that "[o]ne who controls a nuisance is liable for damages caused by that nuisance," even if "the one in control did not create the nuisance." Friends of the Sakonnet v. Dutra, 749 F. Supp. 381, 395 (D.R.I. 1990).  The court in Friends of the Sakonnet, however, did not consider whether a tenant "controls" the nuisance created by contamination on the leasehold, existing but unknown at the start of the tenancy, so as to become liable for the harm that the contamination causes a neighboring landowner. The court simply found the purchasers of a subdivision--serviced by an inadequate sewer system installed by the original developers--liable for any resulting nuisance because the purchasers had "retained control of the sewerage system on their land." Id. at 384 (emphasis added).  The court explained that "[s]uccessors-in-interest can be held liable for abating the nuisance created by their predecessors." Id. at 395 (citing Restatement (Second) of Torts § 839 (1977)).

As just noted, however, the plaintiffs do not even claim that the LNAPL contamination on parcels 9 and 11 was created by Getty Marketing's predecessors-in-interest.  Nor do they explain how Getty Marketing "controls the nuisance"--which, here, is the presence of LNAPL contamination on parcels 9 and 11--in the sense that the subdivision owners in Friends of the Sakonnet "retained

control of the sewerage system."  Instead, the plaintiffs argue

that Getty Marketing's liability for that contamination arises

from its "control over the property" by virtue of its lease.

In support of this theory, the plaintiffs rely heavily on

cases from other jurisdictions cited in the reporter's note to

section 18.1 of the Restatement (Second) of Property: Landlord

and Tenant (1977).  None of those cases, though, recognized that

a tenant came to "control" a nuisance on the leased premises

merely by virtue of its occupancy.  Instead, the tenant in each

of those cases, at a minimum, made use of the feature

constituting the nuisance during its occupancy.  See Reinach v.

City & County of S.F., 331 P.2d 1006, 1007-08 (Cal. Dist. Ct.

App. 1958) (service station driveway); Kelley v. Laclede Real

Estate & Inv. Co., 155 S.W.2d 90, 97-98 (Mo. 1941) (exterior wall

of leased building); Scott v. Olivia, 110 N.W.2d 21, 26-27 (Minn.

1961) ("tenant was in possession of and controlled that portion

of the building which was the cause of the dangerous condition,"

i.e., downspout "common to and for the benefit of the entire

premises") (emphasis added); Dodson v. New Eng. Trust Co., 71

N.E.2d 503, 506-07 (Ohio Ct. App. 1946) ("subspace [that] could

be and was used as additional basement").[13]  Indeed, one of these

_____

[13]This is also true of two of the other cases the plaintiffs
cite, both of which held a tenant liable for injuries that
snowfall upon the roof of the building caused a pedestrian using
an adjacent public sidewalk.  See Calway v. William Schaal & Son,

cases specifically rejects the plaintiffs' view that the tenant's mere occupancy of the premises amounts to "control" over all pre-existing nuisances so as to create a duty to abate, observing that "it may not be fairly said that under all circumstances a tenant would be obligated to make extensive changes in the basic structure of the building in order to eliminate a nuisance created by the landlord." Scott, 110 N.W.2d at 27.

The Restatement of Property appears to endorse this view, citing Scott for the proposition that "[w]here the tenant does not have sufficient control to make the necessary repairs, the tenant should not be held liable," and further noting "authority for the proposition that where abatement of the dangerous condition would require reconstruction rather than repair, the tenant is likewise not liable." Restatement (Second) of Property: Landlord and Tenant § 18.1 n.6 (1977) (citing Knauss v. Brua, 107 Pa. 85 (1884)). Knauss called it "a proposition too

---

155 A. 813, 815-16 (Conn. 1931); Keeler v. Lederer Realty Corp., 59 A. 855 (R.I. 1904). It is worth noting that not only these cases, but also all of those from the Restatement (Second) of Property that the plaintiffs cite, arose out of an accident on a sidewalk adjacent to the property that happened due to some defect in the construction or the maintenance of the premises, as opposed to contamination that occurred without fault on part of either the landlord or the tenant. While the other case the plaintiffs cite, Bridgeton v. B.P. Oil, Inc., 369 A.2d 49 (N.J. Super. Ct. Law Div. 1976), did involve contamination (albeit to the leased premises themselves, rather than to a neighboring site), the tenant there--like the tenant in all the other cases-- made use of the feature causing the contamination, by storing its oil in tanks that had developed leaks prior to the tenancy.

plain for discussion" that "as to . . . third persons, the tenant was not obligated to abate a nuisance created by his landlord," at least where the tenant had not "contributed to the nuisance" by his use of the feature constituting it.  107 Pa. at 85.

Other authorities have likewise concluded that "the law is well-established that in this situation . . . [a] lessee could not be held liable for a defective condition in the leased premises, or for a nuisance, which caused injury and damage to the . . . adjoining property, when such defective condition, or nuisance, was present when it took over under the lease." Malco-Ark. Theatres v. Cole, 132 S.W.2d 174, 176 (Ark. 1939) (rejecting claim against lessee, on the theory that it "operated and controlled and had charge" of neighboring property, for damage due to storm runoff); see also Mitchell v. Foran, 53 P.2d 490, 495 (Kan. 1936); Lindemann v. F. W. Woolworth Co., 8 A.2d 321, 322-23 (N.J. 1939); 52A C.J.S. Landlord & Tenant § 1017 (2005); cf. Hogg v. Chevron U.S.A., 35 So. 3d 445 (La. Ct. App. 2010) (rejecting claim against lessee of filling station to recover for contamination of neighboring property because, among other things, he "was not the lessee at the time of the incident" giving rise to the contamination).  Again, the plaintiffs do not cite any caselaw to the contrary.

Instead, the plaintiffs rely heavily on two provisions from the Restatement (Second) of Torts.  The first, which the

46

plaintiffs cite in support of their negligence theory, states that "[o]ne who takes possession of existing land upon which there is an existing structure or other artificial condition unreasonably dangerous to persons or property outside of the land is subject to liability for physical harm caused to them by the condition," if, among other things, "he has failed, after a reasonable opportunity, to make it safe or otherwise protect such persons against it."  Restatement (Second) of Torts § 366 (1977). The plaintiffs point out that this rule "applies to persons acquiring possession of land by purchase, gift, lease, devise, or otherwise."  Id. cmt. b (emphasis added).  Section 366 further provides that it "should be read together with § 839, as to liability for a private nuisance."  Id. cmt. a.

Section 839, on which the plaintiffs rely in support of their nuisance claim, provides that "[a] possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if," among other things, "he has failed after a reasonable opportunity to take reasonable steps to abate the condition or protect the affected persons against it."  Id. § 839.  As the plaintiffs emphasize, this

> liability is not based upon responsibility for the
> creation of the harmful condition, but upon the fact
> that [the possessor] has exclusive control over the
> land and the things done upon it and should have the
> responsibility of taking reasonable measures to remedy

47

conditions on it that are a source of harm to others. <u>Thus a vendee or lessee of land upon which a harmful physical condition exists may be liable under the rule here stated for failing to abate it after he takes possession</u> . . . even though he had no part in its creation.

<u>Id.</u> cmt. *d* (emphasis added).

As Getty Marketing emphasizes, however, this comment states that a lessee who takes possession of premises subject to an existing nuisance "<u>may be</u> liable"--not that he <u>is</u> liable--for failing to abate it.  Instead, as the comment explains, the tenant's liability for a pre-existing nuisance turns on his degree of "control over the land and the things done upon it." As just discussed, that is the lesson of § 18.1 of the <u>Restatement (Second) of Property: Landlord and Tenant</u> and the cases it cites:  while a tenant can incur liability for a pre-existing nuisance on the premises by making use of the instrumentalities that constitute, or by otherwise controlling, the nuisance, this liability does not follow from the simple fact of the tenancy itself.  Here, though, the plaintiffs rely solely on Getty Marketing's status as a tenant in seeking to hold it liable for failing to abate the pre-existing contamination on the property after learning of it.

Furthermore, even if comment *d* to § 839 supported such a theory of liability, another comment (and the accompanying illustration) to the same section makes clear that it still would

not support the plaintiffs' common-law claims against Getty

Marketing here.  Section 839 makes a possessor of land liable

only for a "nuisance caused . . . by an abatable artificial

condition," and "even though it might conceivably be possible to

abate a particular condition, it is not 'abatable' within the

meaning of this Section unless its abatement can be accomplished

without unreasonable hardship or expense."  Restatement (Second)

of Torts § 839 cmt. *f*.  To illustrate, the Restatement explains:

> A is in possession of land upon which is situated a
> tank for the storage of petroleum.  B is in possession
> of land 500 yards from this tank.  Without A's
> knowledge of negligence the tank develops an
> underground leak and a quantity of oil flows out,
> saturates A's land and drains into an unknown
> subterranean stream that carries it to B's land.  As a
> result, B's well that supplies his drinking water is
> polluted and rendered unfit for use.  When A learns of
> this he immediately removes all the remaining oil from
> the tank but the oil already in his land continues to
> pollute B's well for some time.  It is found that A's
> maintenance of the oil tank was not abnormally
> dangerous.  A is not liable to B for failing to take
> action to remove the oil already in his land, since it
> would not be practicable to do so.

Id. § 839 cmt. *f*. ill. 1 (emphasis added).  That hypothetical

more or less describes the undisputed facts of this case.  Once

Getty Marketing learned of the contamination in the wells

adjacent to the plaintiffs' property, it checked for leaks in all

of the active pipelines on the leased premises, but found no

evidence of any, and subsequent testing revealed that the

substance polluting the wells did not come from the tanks on the

leased premises either.  While, the plaintiffs allege, that pollution continues to migrate onto their property, comment *f* and illustration 1 make clear that Getty Marketing is not liable for failing to abate that condition--even assuming that Getty Marketing, simply by commencing its tenancy, could have acquired the duty to abate any pre-existing nuisance there.

Again, the plaintiffs have not come forward with any case, from any jurisdiction, applying §§ 366 or 839 of the Restatement (Second) of Torts (or the principles they recognize) to hold a tenant liable for pre-existing contamination on the leasehold. Nor, significantly, does any such case appear among those cited in the Restatement's annotations to these sections.  Since they were published more than 35 years ago, one would expect such a case to exist--if, in fact, the Restatement supports the plaintiffs' theory of liability.  Thus, the fact that neither the reporters of the Restatement, the plaintiffs, nor this court has located such a case lends further support to the conclusion that the Restatement simply does not support the plaintiffs' common-law claims against Getty Marketing.

The plaintiffs' theory of Getty Marketing's common-law liability, then, appears to be unprecedented in any jurisdiction. This is unsurprising, because holding a tenant liable for failing to abate pre-existing contamination on the leasehold, simply because the tenant had the misfortune of possessing the leasehold

at the time the contamination was discovered, would represent a dramatic--and haphazard--expansion of tort law.  Indeed, the plaintiffs' theory would apply not only to an international oil company leasing a marine terminal, like Getty Marketing, but also to a family leasing a single-family home who discovers, during their tenancy, that heating oil which leaked from an unused storage tank long before they moved in has contaminated their neighbors' properties.  The plaintiffs have not articulated any sound policy reason for subjecting a blameless party to that kind of potentially ruinous liability.

In any event, as discussed at the outset, this court has "no warrant to extend state [tort] law." Hatch v. Trail King Indus., Inc., 656 F.3d 59, 71 (1st Cir. 2011).  This court has no reason to believe that Rhode Island would recognize a theory of common-law liability that has yet to be recognized there or, so far as this court can tell, in any state.  Accordingly, Getty Marketing is entitled to summary judgment on the plaintiffs' negligence and nuisance claims.

### 2.    Water Pollution Control Act

Under Rhode Island's Water Pollution Control Act, "[a]ny person who shall negligently or intentionally pollute groundwater shall be liable to any other person who is damaged by that pollution." R.I. Gen. Laws § 46-12-21.  While the Act does not

define "pollute," the term "polluting" is defined as "the causing

of pollution." Id. § 46-2-1.  As noted supra, Getty Marketing

has moved for summary judgment on the plaintiffs' claim under

this statute on two independent bases:  there is no evidence

(a) that LNAPL was discharged onto the property prior to the 1980

effective date of the Act, which does not apply retroactively, or

(b) that Getty Marketing "pollute[d] groundwater."

While the plaintiffs argue (albeit without pointing to any

supporting evidence) that a material factual dispute exists as to

when the discharge occurred, they do not address Getty

Marketing's point that they lack proof that it "polluted

groundwater."  Again, there was no evidence of any leak in the

pipelines in use by Getty Marketing, and testing indicated that

the LNAPL migrating onto the plaintiffs' property had not come

from the storage tanks on Getty Marketing's leasehold, so the

basis of any claim that it "caused" the LNAPL pollution is

unclear.  Indeed, though his decision is not binding on the

plaintiffs, the hearing officer concluded that Getty Marketing

was not liable under the Water Pollution Control Act merely for

failing to remediate pollution on its leasehold that it did not

release.  In re Getty Marketing Mktg., Inc., slip op. at 35.

In any event, by failing to address Getty Marketing's

contention, in support of its summary judgment motion, that the

plaintiffs lack evidence that it "polluted groundwater" in

52

violation of the Water Pollution Act, the plaintiffs have waived any argument to the contrary.  "If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived."  <u>Grenier v. Cyanamid Plastics, Inc.</u>, 70 F.3d 667, 678 (1st Cir. 1995) (quotation marks omitted).  Getty Marketing is entitled to summary judgment on the plaintiffs' claim under the Water Pollution Control Act.

## IV. <u>Conclusion</u>

For the foregoing reasons, Getty Marketing's motion for summary judgment on the defendants' third-party claims[14] is GRANTED, the defendants' cross-motion for summary judgment on its contractual indemnification claim against Getty Marketing[14] is DENIED, and Getty Marketing's motion for summary judgment on the plaintiffs' claims[15] is GRANTED.  Getty Marketing is DISMISSED from the case.  Counsel for the remaining parties shall contact the undersigned's deputy clerk to schedule a status conference to discuss a schedule for resolving the balance of the litigation through further motion practice or trial.

---

[14]Document no. 27.

[14]Document no. 40.

[15]Document no. 49.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 11, 2013

cc:  Gerald J. Petros, Esq.
     Robert K. Taylor, Esq.
     Alexandra K. Callam, Esq.
     Mitchell R. Edwards, Esq.
     Jennifer R. Cervenka, Esq.
     Mark W. Freel, Esq.